**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

FILED 2013 DEC 10 P 2:

**CIVIL RIGHTS COMPLAINT**

Robert Lindsay Jr.,
Plaintiff(s),
(Full name(s); Do not use *et al.*)

v.

Michael Werdman M.D.
Chair of Emergency Med.
Bridgeport Hospital

Case No. 3:13cv1829(AWT)
(To be supplied by the court)

Defendant(s).
(Full name(s) and capacity, e.g., official capacity, individual capacity, or official and individual capacitites) (Do not use *et al.*)

**A. PARTIES**

1. Robert Lindsay Jr (Plaintiff) is a citizen of Connecticut (State) who presently resides at 140 Fairfield Ave Apt 10B Bridgeport (mailing address).

2. Defendant Michael Werdman M.D (name of first defendant) is a citizen of Connecticut (State) whose address is 267 Grant St. Bridgeport Ct. 06604.

and who is employed as Chair of Emergency Medeine (title and place of employment).

At the time the claim(s) alleged in this complaint arose, was this defendant acting under color of state law? ____Yes ____No. If your answer is "Yes," briefly explain:

________________________________________________________________________

________________________________________________________________________

3. Defendant ______________________________ is a citizen of ________________
(name of second defendant) (State)

whose address is ________________________________________________________

and who is employed as ____________________________________________.
(title and place of employment)

At the time the claim(s) alleged in this complaint arose, was this defendant acting under color of state law? ____Yes ____No. If your answer is "Yes," briefly explain:

________________________________________________________________________

________________________________________________________________________

(If more space is needed to furnish the above information for additional defendants, continue on a blank sheet which you should label "A. PARTIES." Be sure to include each defendant's complete address and title.)

**B. JURISDICTION**

1. Jurisdiction is asserted pursuant to (CHECK ONE)

__________ 42 U.S.C. § 1983 (applies to state defendants)

__________ ***Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics***, 403 U.S. 388 (1971) and 28 U.S.C. § 1331 (applies to federal defendants)

2. Jurisdiction also is invoked pursuant to 28 U.S.C. § 1343(a)(3). (If you wish to assert jurisdiction under different or additional statutes, you may list them below.)

________________________________________________________________________

________________________________________________________________________

## C. NATURE OF THE CASE

**BRIEFLY** state the background of your case. emergency room Discrimination And malpractice

## D. CAUSE OF ACTION

I allege that the following of my constitutional rights, privileges, or immunities have been violated and that the following facts form the basis of my allegations: (If more space is needed to explain any allegation or to list additional supporting facts, continue on a blank sheet which you should label "D. CAUSE OF ACTION.")

**Claim I:** ______________________________

______________________________

______________________________

Supporting Facts: (Include all facts you consider important, including names of persons involved, places, and dates. Describe exactly how each defendant is involved. State the facts clearly in your own words without citing legal authority or argument.)

**Claim II:** ______________________________________________

____________________________________________________________

____________________________________________________________

Supporting Facts:

**Claim III:** ______________________________________________

____________________________________________________________

____________________________________________________________

Supporting Facts:

## E. PREVIOUS LAWSUITS

1. Have you begun other lawsuits in state or federal court dealing with the same facts involved in this action?
____Yes __✓__No. If your answer is "Yes," describe each lawsuit. (If there is more than one lawsuit, describe the additional lawsuits using this same format on a blank sheet which you should label "E. PREVIOUS LAWSUITS.")

a. Parties to previous lawsuit:

Plaintiff(s):______________________________

Defendant(s):______________________________

b. Name and location of court and docket number______________________________

c. Disposition of lawsuit. (For example, was the case dismissed? Was it appealed? Is it still pending?)

______________________________

d. Issues raised: ______________________________

______________________________

e. Approximate date of filing lawsuit:______________________________

f. Approximate date of disposition: ______________________________

2. If you have filed other lawsuits in this court in the last ten (10) years that are not related to the acts complained of in Part D, please list them. (If you need additional space, use a blank sheet which you should label "E. PREVIOUS LAWSUITS.")

______________________________

______________________________

______________________________

______________________________

______________________________

______________________________

## F. REQUEST FOR RELIEF

I request the following relief: emotional stress, pain and unnecessary suffering for relief of $30,000

## G. JURY DEMAND

Do you wish to have a jury trial? Yes ✓ No ____

| | |
|---|---|
| Original signature of attorney (if any) | Plaintiff's Original Signature |
| Printed Name | Robert Lindsay Jr.<br>Printed Name |
| | Robert Lindsay Jr. Apt 10B<br>140 Fairfield Ave BPT Ct 06604 |
| ( )<br>Attorney's full address and telephone | (203) 526-2200<br>Plaintiff's full address and telephone |
| Email address if available | Email address if available |

## DECLARATION UNDER PENALTY OF PERJURY

The undersigned declares under penalty of perjury that he/she is the plaintiff in the above action, that he/she has read the above complaint and that the information contained in the complaint is true and correct. 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Executed at Bridgeport (location) on 12-10-2013 (date).

Plaintiff's Original Signature

(Rev. 9/22/09)

# STATE OF CONNECTICUT

DEPARTMENT OF PUBLIC HEALTH

September 18, 2012

Robert Lindsay
140 Fairfield Avenue
Apt. 10b
Bridgeport, CT 06604

Complaint #CT00014494

Dear Mr. Lindsay:

Your letter regarding care and services provided by Bridgeport Hospital will be investigated by the Facility Licensing & Investigations Section.

The Facility Licensing & Investigations Section of the Department of Public Health is responsible for investigating complaints regarding care and service issues for facilities, which we license pursuant to Connecticut General Statutes, the Regulations of Connecticut State Agencies and the Code of Federal Regulations.

Please note that the Department does not have jurisdiction with regards to discrimination issues. Therefore an investigation will not be conducted into this issue since it is being addressed by the Commission on Human Rights and Opportunities. The Department will review the issues for facilities, which we license pursuant to Connecticut General Statutes, the Regulations of Connecticut State Agencies and the Code of Federal Regulations.

During the investigational process, a representative of the Facility Licensing & Investigations Section will contact you. The purpose of the contact is to ascertain if you have additional information to share or to clarify issues that may have arisen as a result of the process.

In accordance with federal regulations, complaints involving institutions participating in the Medicare/Medicaid programs must be prioritized in accordance with specified Federal mandates. Please be assured that all complaints within the jurisdiction of the Facility Licensing & Investigations Section will be investigated. Upon the conclusion of our investigation you will receive a copy of the investigational report.

Thank you for bringing these issues to the attention of the Department. If I can be of any further assistance, please feel free to contact me at (860) 509-7400.

Sincerely,

Donna Ortelle, RN, MSN

Donna Ortelle, RN, MSN
Supervising Nurse Consultant
Facility Licensing & Investigations Section

DMO

# STATE OF CONNECTICUT

DEPARTMENT OF PUBLIC HEALTH

June 20, 2013

Robert Lindsay
140 Fairfield Avenue
Apt. 10b
Bridgeport, CT 06604

Complaint # CT00014494

Dear Mr.Lindsay:

The Department of Public Health's Facility Licensing and Investigations Section (FLIS) has completed an investigation at Bridgeport Hospital regarding the issues in your correspondence.

The investigation included onsite visits conducted by Department representatives, tours of the institution, record reviews, staff and patient interviews.

Based upon this extensive review, we were able to validate non-compliance with federal/state laws within the jurisdiction of the Department, however, they were unrelated to your complaint. Attached to this correspondence is a copy of our findings along with the healthcare institution's plan to correct the areas of non-compliance.

In accordance with the current FLIS policy and the direction of the Centers for Medicare/Medicaid Services, this letter and attached copy of the findings will serve as the results of our review.

Thank you for providing the Department with the opportunity to review your concerns.

Respectfully,

P. Gannon RNSNC

Patricia M. Gannon R.N.
Supervising Nurse Consultant
Facility Licensing and Investigations Section

PMG:lsl

Date: 7-15-2013

Complaint

TO: Dr. Jewel Mullen

(Commissioner)

From: Robert Lindsay Jr.

(Patient)

RE: Bridgeport Hospital Emergency RM. Investigation

Complaint# CT 00014494

Dear Dr. Mullen

I (ROBERT) was not satisfied with your department investigation on 6-20-2013 at Bridgeport Hospital. First of all; according to your staff letter saying they interview Bridgeport Hospital staff and patient. I (ROBERT) the patient was not interview in other words your investigation was one sided. Neither I nor my witnesses were interview. I consider this interview to be bogus and favorable toward Bridgeport Hospital. Your staff claim they did not have my cell ph. # to contact me which is false because they did call me several times and let the phone ring one time and then hung up. I(ROBERT) saw the number on my cell and immediately call back to your department operator for caller contact but to no avail .This went on several time with your department: it tell me that your staff really did not want to interview me .However, I (ROBERT) learned things from the Commissioner of Human Right and opportunity investigation on the same complaint about Bridgeport Hospital that your department should have pick up! IN conclusion : I hope you will take a look at this investigation and bring it to a more professional not partial conclusion. Besides, if your staff really wanted to talk to me they could of contact me by my mailing address requesting for phone conversation.

YOUR TRULY

ROBERT LINDSAY JR.

(203)449-2475

# STATE OF CONNECTICUT

DEPARTMENT OF PUBLIC HEALTH

July 29, 2013

Robert Lindsay, Jr
140 Fairfield Avenue
Apartment 10b
Bridgeport, CT 06604

Dear Mr. Lindsay:

Your letter to Commissioner Jewel Mullen dated July 15, 2013 regarding the quality of the Department's investigation conducted at Bridgeport Hospital and the Department's inability to communicate with you throughout the investigation, has been referred to me for a response.

The investigative process is very comprehensive and an objective procedure. It includes medical record review, observations and interviews with facility staff who have direct involvement with the concerns or issues that have been identified. I have reviewed the investigative file and while you allege in your correspondence that the investigation was "one-sided", please let me assure you that an objective investigation was completed. Review has identified that Bridgeport Hospital has met the minimum standard of care with compliance with state and federal laws and regulations.

Review of the communication log in the investigative file identified that the investigator made attempts to contact you, although unsuccessful, three occasions on February 4, 2013 and one occasion on April 18, 2013. The April 18, 2013 attempt was made pursuant to contact that you made on April 15, 2013 with Donna Ortelle, Public Health Services Manager reporting a change in telephone number. While a new number was provided, when called the surveyor was greeted with a message indicating that "the message mailbox had not been set up. Your written correspondence to the Department serves as the allegation and as our correspondence to you dated September 18, 2012 indicates "During the investigational process, a representative of the Facility Licensing & Investigations Section will contact you. The purpose of the contact is to ascertain if you have additional information to share or to clarify issues that may have arisen as a result of the process", this communication is done as a matter of practice telephonically.

I am sorry that the Department's investigation did not meet your expectation. Should you have any questions, please do not hesitate to contact me.

Sincerely,

Barbara S. Cass

Barbara S. Cass, R.N.
Section Chief
Facility Licensing and Investigations Section

C.c. Commissioner Jewel Mullen, M.D., M.P.H., M.P.A.
Wendy Furniss, R.N.C., M.S., Branch Chief, HQSB

# Complaint

Date: 8-9-2013

#CT00014494

TO: Dr. Jewel Mullen

(Commissioner)

From: Robert Lindsay Jr.

(Patient)

RE: Barbara Cass Letter response 7-29-2013

Dear Commissioner

I (Robert) can see why you referred my complaint to DPH supervisor Barbara Cass; it is to prevent the unprofessional and ridiculous involvement into such a matter. That is why I (Robert) did not ask to speak to or contact Ms. Cass, because after speaking to her staff Donna Ortelle, Patricia Gannon and Dawn Hebert investigation report. I (Robert) came to the conclusion that they are a reflection of a corporate health care supervisor. However, now that I suspect your reluctant of this case I will seek higher authority to forward my complaint.

ROBERT LINDSAY JR.

(203)449-2475

**STATE OF CONNECTICUT**
**COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES**

**Robert Lindsay**
COMPLAINANT

vs.

**DECISION ON RECONSIDERATION REQUEST – Rejected**

**Bridgeport Hospital**
RESPONDENT

CHRO Case No. 1220254

10-29-2013
Date Filed: March 15, 2012

## SECTION I - SUMMARY OF ORIGINAL DISMISSAL

Robert Lindsay (Complainant) filed a complaint against Bridgeport Hospital (Respondent) with the Commission on Human Rights and Opportunities (Commission) on March 15, 2012. The Complainant complained that the Respondent discriminated against in him because of his race (African-American) and color (black) by denying him equal access to services. The Respondent is a hospital.

The Commission dismissed the complaint for no reasonable cause on August 12, 2013. The Complainant was notified of the dismissal of his complaint on that date. The notice advised the Complainant of the right to request reconsideration.

## SECTION II - TIMELINESS OF THE REQUEST

CONN. GEN. STAT. § 46a-83(e) and Section 46a-54-62a(b) of the REGULATIONS OF CT STATE AGENCIES provide that a complainant may request reconsideration of the Commission's finding dismissing the complaint, provided the request is filed within 15 days from the issuance of the Commission's determination.

The Commission mailed notice of its dismissal of the complaint to the Complainant on August 12, 2013. The Complainant requested reconsideration in a document received by the Commission on September 3, 2013. The request itself is dated August 29, 2013, two days after the 15-day reconsideration period expired. The request itself was received 22 days after mailing of notice of the dismissal. Since this is more 15 days from the date the Commission mailed notice of its dismissal to the Complainant, the request for reconsideration is untimely.

The Commission mailed a letter to the Complainant dated September 6, 2013 in which it acknowledged receipt of the request for reconsideration on September 3, 2013. The Complainant has not contested that claim nor proven that the Commission received the

request within the allotted time. Nor has the Complainant alleged and proven that there was some justifiable delay in the receipt of the Commission's notice of dismissal.

**SECTION III - DETERMINATION ON RECONSIDERATION**

Section 46a-54-62a(c) of the REGULATIONS OF CT STATE AGENCIES states that "The executive director shall reject untimely requests for reconsideration without a formal review of the substance of the request for reconsideration."

Since the Complainant's request for reconsideration is untimely, it must be dismissed without a review of the merits of the request.

**SECTION IV - RECOMMENDATION**

I recommend that the Complainant's request for reconsideration be **REJECTED**.

10.9.13
DATE

Charles Krich
Charles Krich, Principal Attorney

**ADOPTED**

10/9/13
DATE

Tanya A. Hughes
Tanya A. Hughes, Interim Executive Director

**Robert Lindsay v. Bridgeport Hospital** **Date: 7-21-2013**
**#1220254**

## Summary of Facts

1) Complainant allege he was rush to Bridgeport Hospital by ambulance / paramedic due to illness on three separate occasion January 4TH – January 6TH and January 8TH 2012.

2) Complainant alleges on all three occasion he sat in the patient emergency room for hour waiting to see the Triage Nurse.

3) Complainant allege despite his condition he was not admitted to Bridgeport hospital as an in-patient.

4) Complainant alleges he was denied full and equal service at Bridgeport hospital on account of his race, African American or color black.

5) Respondent denies it discriminate against the complainant.

## Emergency Department Entrance

### Type of admittance

1) Walk-in/self

   Clerk – medical record-triage nurse and then to be to be seem by a MEDICAL Doctor.

2) Ambulance/paramedic

   Trauma Nurse –Doctor Care and then to surgery.

**Comment: On all three occasion of January 4th 6th and 8th of 2012 I (Robert) was transported by ambulance but was not seem by a Medical Doctor.**

**Robert Lindsay v. Bridgeport hospital** **Date: 7-21-2013**

**#1220254**

## Finding of Facts

## Rebuttal

1) The respondent documentation concerning January -4-20`12 is manipulating and false.

2) The respondent documentation concerning January-6-2012 is'cunning and untruthful.

3) The respondent documentation concerning January-8-2012 is crafty and in valid.

4) The investigator must re- examines the allegations below and come to a more positive find.

5) According to the date set for July -31-2013 the investigator is not thorough and complete. Also, according to the fact finding conference the investigator did not ask the complainant were the documents true/false.

# Finding of Facts

# Rebuttal

## Emergency Department visits

JANUARY -4-2012

1) Ambulance –Trauma Nurse – emergency waiting room – clerk –medical records –Triage Nurse – APRN Nurse but was not seem by a Medical Doctor. Vomiting continue!

JANUARY -6-2012

2) Ambulance – Trauma Nurse-emergency waiting room- clerk – medical records – Triage Nurse- APRN Nurse but was not seem by a Medical Doctor. Vomiting continue!

JANUARY -8-2012

3) Ambulance –Trauma Nurse –emergency waiting room –clerk –medical records –Triage Nurse but was not seem by any health care professional. However, was told by nurse and security to leave the hospital or be thrown out. Vomiting continue!

Jan-4-2012

Trauma Nurse= female Caucasian

Triage Nurse =female Caucasian

APRN Nurse = male Caucasian

Jan-6-2012

Trauma Nurse = female Caucasian

Triage Nurse = female Caucasian

APRN Nurse= male Caucasian

Jan-8-2012

Trauma Nurse = female Caucasian

Triage Nurse =female Caucasian

Physician assistance did not come into the patient examine room to evaluate the complainant but told I (Robert) to leave the hospital. = female Caucasian

Vomiting continue!

MEDICAL RECORD # 00289290



# ST. Vincent Hospital

## 4th visit

January -9-2012

Transported to St. Vincent by ambulances at the advice of the paramedic to be greeted by the Triage Nurse with open arms of care.

Then seem by (2) African American doctors who examine I(the complainant) to be admitted to the hospital as an in-patient for two days.

Vomiting discontinue!

**Comment: In a majority African American community of Bridgeport Hospital there is no African American doctor's staff to the hospital.**

**Robert Lindsay v. Bridgeport Hospital # 1220254**
**Date: 7-21-2013**

## Bottom Line

I(Robert) believe that Bridgeport Hospital has created a system/process and amasses cover up base on race ,ethnicity and gender to eliminate the financial burden to the hospital. Since African Americans is the majority in that community and the most deprived of health insurance, Bridgeport Hospital devise a plan to discriminate against the so called as BPT. Hos. Representative Michael Werdimann call undesirables; hoping that the plan will go undetectable against the state and federal investigators. As a former Patient Care Technician trainee and BPT. Hos. Clinic patient; I (Robert) had the opportunity to observe many things that would be consider an act of discrimination. State and Federal investigators must go inside the hospital and dig up records, policies and most all interview employees, patients and the community at large. I(Robert)the complainant personally witness the whites staffs discriminate against me during my three days visit at the Bridgeport Hospital Emergency Department.

**Witness [angel Morales ph.# 203-218-7434 emergency room patient]**

## Common Law

## Tort Liability

Jan-4-2012/Jan-6-2012[APRN; negligence- failure to use reasonable care –not a doctor.

Jan-8-2012 [physician assistance; intentional tort-act with intent of injury-racist.

Cc: Wellcare-MEDICARE (representatives)

Dr. Jewell Mullin (commissioner DPH)

Ben Jealous (NAACP)

THANK YOU

ROBERT LINDSAY JR.

**Robert Lindsay v. Bridgeport Hospital** **Date: 7-21-2013**

**#1220254**

## Conclusion

As black peoples and peoples of color enter the 21st century racism will change it appearance from the Jim Crow era of the 1950s to a more conservative approach of the year 2000. Bridgeport Hospital in all it manifestation has demonstrated to me that it is practicing discrimination. Their white staff clearly shown I(the complainant) that I was undesirable to treat as a patient. Although i(Robert) received a CNA certificate and a Patient Care certificate from Housatonic Community College which I did my clinical training at Bridgeport hospital the year of august 2012;the emergency department has shame me. I(Robert) learned from this experience that peoples don't have to prejudice to be a racist.

All in all, the comment made by Bridgeport Hospital representative July 9 2013 at the fact finding conference in CHRO Hartford office referring to African Americans as undesirables should be enough for a reasonable cause. The percentage of the most population was the subject.

YOUR TRULY

ROBERT LINDSAY JR.

(203)449-2475

**Request for Reconsideration** **Date: 8-29-13**

TO: C H R O

(Acting manager)

Yvonne Duncan

From: Robert Lindsay Jr.

(Complainant)

Dear Miss Duncan

I (Robert) has presented amble evident of reasonable cause to investigate discrimination practices at Bridgeport Hospital. The dismissal of no reasonable cause base on the merits is vague. In other words, what does C H R O need for reasonable cause? A sign confession from Bridgeport Hospital stating they do discriminate against AFRICAN AMERICANS.

First of all, from the administration own mouth at the fact finding hearing Mr. Michael Weidman chair of emergency medicine of BPT. Hos.stated that BPT Hos. Out of all the hospital in Connecticut serve the most percentage of the undesirables referring to AFRICAN AMERICANS. That statement alone is the same as using the N-word toward AFRICAN AMERICANS.

Secondly, I (Robert) have done extensive research on discriminative practices filed on hospitals in general and information concerning BPT. Hos. negligence that lead to the death of it patients. Mr.Werdman statements concerning my emergency visits and BPT. Hos. clinic being no part of the hospital is totally invalid. Being seem by the Triage Nurse on arrival is inaccurate. Being treated is also inaccurate. (DOC. #1page1 of 2 How the civil justice system protect patients.)

Third, BPT. Hos. emergency room discrimination-Bing. Discrimination in Emergency Room. YES, IT happens! Especially toward AFRICAN AMERICAN. Why? (DOC.#2Apage 1 of 1) (DOC.#2Bpage1,2 of 4)

Fourth, Racist Doctors study shows 66% of doctors and nurses are racially bias toward their black patients. (DOC,#3 page 1 of 4) IT is said that black people in the United States only represent only 12% of the total population ,then why do black account for the majority of all the diseases? It is because of racist policies- regulation –jurisdictions that allow discriminative practices. That is why they get away with murder of black peoples it is called the opportunity to kill.

Finally, Because of the minimum standard of care regulation by the DPH and limited jurisdiction of CHRO outlined by the legislators BPT. Hos. will continue their discriminatory practices. In conclusion, it is widely known that BPT. Hos. discriminates because one ignorance and retaliation these practices will continue until someone step up to the plate. (DOC.# 1page of 3)What happen to me on Jan 4 .6 and 8th of 2012 at BPT . Hos. I(Robert) felt that I was dump a practices that is outlawed under the (EMALTA) by CONGRESS in 1986. (DOC #4)(DOC#5) (DOC.#6)

Your Truly
Robert Lindsey Jr
(203)449-[illegible]

# PREPARING AND WINNING MEDICAL NEGLIGENCE CASES

THIRD EDITION



EDITOR
CYRIL H. WECHT, MD, JD

EDITOR:

CYRIL H. WECHT received his MD degree from the University of Pittsburgh and his JD degree from the University of Maryland. He is certified by the American Board of Pathology in anatomic, clinical, and forensic pathology. A distinguished professor, chairperson on various prestigious boards, and worldwide lecturer, he is also a prolific author with over 525 publications to his credit.

An expert consultant, Dr. Wecht has been called to testify in more than 1,000 civil, criminal, and workers compensation cases throughout the United States and abroad. He has also appeared on numerous TV and radio shows to give his evaluation of the medico-legal and forensic scientific aspects of high profile cases ranging from the assassination of Pres. John F. Kennedy to the deaths of JonBenét Ramsey, Amadou Diallo, Laci Peterson, and Chandra Levy, among many others.

CONTRIBUTORS:

LEONARD BERLIN, MD
MARY M. CARRASCO, MD
K. RYAN CONNOLLY, MD
L. JEAN DUNEGAN, MD
LOGAN A. GRIFFIN, MD
MATTHEW L. HOWARD, MD
JAMES C. JOHNSTON, MD, JD
JULIUS LANDWIRTH, MD, JD
THOMAS D. MAHER, MD
WILLIAM J. MANGOLD, JR., MD, JD
DARREN P. MAREINISS, MD, JD
ERNEST H. NEIGHBOR, MD, JD
MATTHIAS I. OKOYE, MD, JD
JEFFREY P. PHELAN, MD, JD
JULIUS S. PIVER, MD, JD
PARALUMAN Q. RAVANO, MD
ROBERT L. SADOFF, MD
DAVID L. SAMANI, MD
S. SANDY SANBAR, MD, JD
CYRIL H. WECHT, MD, JD
RICHARD S. WILBUR, MD, JD
BRUCE L. WILDER, MD, JD



JURIS PUBLISHING, INC.
71 New Street
Huntington, New York
11743 USA

www.jurispub.com

Juris Publishing, Inc.
ISBN 978-1-57823-238-3
9 781578 232383

CHAPTER 16B

# Malpractice in Medical Emergencies

by Gordon L. Ohlsson*

---

**SCOPE NOTE**

**Emergency medicine has become crucial in America to the overall delivery of health care. In many communities, the systems for delivering medical services in an emergency are in fact the prime source of first-line care. The number of cases alleging malpractice in the provision of these services has grown in tandem with their increased role as medical services providers.**

**Medical care in emergencies is delivered in two primary stages. One involves first responders, including paramedics, emergency medical service personnel, and firefighters; these persons strive to get the best possible treatment to a victim in the field and, when necessary, to transport a victim with all speed to the nearest appropriate hospital. The second stage involves personnel at the hospital in the emergency room; they have all of the hospital's resources available to them and can furnish a wide variety of services to persons of many different needs.**

**In recent years, the lines between these two stages of treatment have become less clear. Better technology allows ambulance crews to provide more sophisticated care in the field and also allows doctors at the hospital to have immediate access to a lot of patient information. Persons in both stages of emergency care are held to a professional standard of care in the treatment of patients, and cases alleging professional negligence are brought against both first responders and emergency room physicians and other personnel.**

**This chapter discusses the liability for professional negligence of individuals, hospitals, governmental authorities, and others in the provision of emergency medical services. The chapter addresses liability of ambulance crews, emergency medical technicians, paramedics, firefighters, and others who provide emergency treatment in the field and transport to hospitals, as well as both the direct and vicarious liability of hospitals and others who are responsible for providing ambulance and paramedic**

---

* Attorney, Atlanta, Georgia; Revision Editor, *Medical Malpractice* (Matthew Bender), R.H. Long, *The Law of Liability Insurance* (Matthew Bender); Contributing Author, *Medical Malpractice Reports* (Matthew Bender).

(Rel.75–8/04 Pub.370)

Doc 4 pp. 8-9



recent past have been provided with adequate protection against radiation of the public. However, occasionally smaller hospitals have been rebuilt by contractors who failed to understand the ability of radiation to penetrate ordinary building walls, resulting in undue radiation of other personnel, often clerical ones removed from radiology by job description, but not by desk location.

If a hospital utilizes radioactive materials within a nuclear medicine unit, it has special problems, particularly in the disposition of radioactive waste. Regulations for the disposal of radioactive waste are promulgated by both federal and state governments. In most instances, the technical personnel in the radiology and/or nuclear medicine departments are capable of handling the material appropriately, and breaches of standards are few and relatively non serious. However, when the disposal is in the hands of nontechnical personnel, particularly of the unskilled labor category, it is possible to have serious liability consequences. In large institutions there should be specially identified personnel responsible for this disposition, but in medium-sized institutions this task may be delegated to a relatively unsophisticated staff person lacking specific expertise in radiation hazards.

Also, contractors who remove infectious and radioactive waste from hospitals are sometimes irresponsible and fail to follow statutory guidelines. This has resulted in the disposal of radioactive and other hazardous waste in undesignated places, such as landfills, waterways, lakes and oceans. Such irresponsibility can be traced back to the hospital's failure to contract with responsible waste disposal companies and, therefore, has been a source of hospital liability.

### [3] Emergency Department

The emergency department is an area of special peril to visitors. More attention is paid to stopping the flow of blood than to wiping it up from the floor. Much of the activity is at a frantic pace, and the safety of persons other than the patient being cared for is secondary in the minds of the emergency department personnel. There is a further hazard in the heavy flow of traffic in and out of the area—traffic which is unusually high in non hospital personnel. While most of these persons are acquainted with the hospital—police, ambulance drivers, paramedics, etc.—they present more than the usual employee risk. Here, as in other areas, overeager budget cutting can lead to a large liability settlement.

The difficulties in the emergency department are compounded by the high level of emotion, particularly among the visitors. The staff is usually aware of hazards and able to avoid them. Visitors, who tend to be far more

: radiation of
n rebuilt by
to penetrate
:r personnel,
ı, but not by

ıedicine unit,
ıactive waste.
;ated by both
. personnel in
.e of handling
and relatively
: nontechnical
ıssible to have
.d be specially
medium-sized
ıisticated staff

re waste from
ory guidelines.
rdous waste in
ı oceans. Such
ɔ contract with
ɜen a source of

ɔ visitors. More
g it up from the
of persons other
f the emergency
'y flow of traffic
in non hospital
h the hospital—
: more than the
dget cutting can

pounded by the
e staff is usually
ıd to be far more



concerned with the condition of their friend or relative than they are with their own safety, are inclined to be dangerous, not only to themselves, but often to others. This is particularly true when the various parties to an altercation have been brought to the same hospital for treatment. Failure to recognize this potential for risk can lead to more injury, liability and damages. Security measures in and around an emergency department require more than an ordinary level of watchfulness.

Especially the personnel must be trained to watch the waiting room for patients who are in need of immediate care and cannot wait their turn in a busy time. Triage of seriously ill patients is a necessity. There are specific rules for the care of special conditions such as chest pain and pneumonia which must be adhered to in order to avoid liability. There is also a requirement for assured follow-up of patients leaving the department who may not require immediate treatment or hospitalization, but who have a condition which could worsen without further care. They must be given careful warnings about the need for return to a physician.

### [a] EMTALA

A legislative mandate, the Emergency Medical Treatment and Active Labor Act, (EMALTA),[8] is an Act of Congress passed in 1986. It is also known as the patient anti-dumping law and "places obligations of screening and stabilization upon hospitals and emergency rooms that receive patients suffering from an 'emergency medical condition.'"[9]

In a medical emergency, a hospital must provide such medical examination and such treatment as may be required to stabilize the medical condition and then continue to treat the patient's condition at that hospital or transfer the patient to another medical facility where the appropriate care is available. This Act is particularly perilous because under EMTALA, a violation of the Act can occur without a demonstration of an improper motive on the hospital's part.[10]

The fact of the hospital's liability is spelled out. EMTALA's civil enforcement provisions specify that "any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of [the Act] may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located."[11]

---

[8] 42 U.S.C. § 1395dd.

[9] Roberts v. Galen of Virginia, 525 U.S. 249, 250 (1999).42 U.S.C. § 1395dd(b).

[10] Roberts, 525 U.S. at 250.

[11] 42 U.S.C. § 1395dd(d)(2)(A).

# CHAPTER 16A

# Nursing Negligence

SYLLABUS

¶ 16A.01. Introduction
¶ 16A.02. Nurses' Liability
[1] Standard of Care
[a] In General
[b] Special Standards Applicable to Nurses
[c] The Locality Rule
[2] Problems of Proof and Res Ipsa Loquitur
¶ 16A.03. Specific Types of Nursing Negligence
[1] In General
[2] Administration of Medications
[3] Failure to Act
[4] Failure to Communicate
[5] Error in the Use and/or Supervision of Equipment
[6] Errors in the Surgical Suite
[7] Aiding or Allowing the Negligent Conduct of Another
[8] Nursing Negligence in the Non-Hospital Setting
¶ 16A.04. Liability of Others for a Nurse's Negligence
[1] Hospitals
[2] Physicians
¶ 16A.05. Discovery
¶ 16A.06. Contributory Negligence

## ¶ 16A.01. Introduction

While in the past most medical malpractice actions involved the conduct of physicians, today more and more medical malpractice cases involve allegations of nursing negligence. The reason for this change is the fact that in the last few decades the role of the registered nurse has changed from that of a passive, servile employee to that of an assertive, decisive health care provider. Today, the professional nurse monitors complex physiological data, operates sophisticated lifesaving equipment, and coordinates the delivery of a myriad of patient services. As a result, the reasonably prudent nurse no longer waits for and blindly follows physician's orders. As physicians depend more heavily on skilled nursing judgment, specialization becomes more pronounced, and independent nurse practitioners become more widely utilized, nursing malpractice will [illegible]

Despite these protests, Kehayes made several more unsuccessful attempts to start the IV in the plaintiff's left hand. Kehayes finally left to telephone the doctor, who prescribed an oral antibiotic. When the plaintiff's husband arrived, he found her crying out in pain from the multiple needle sticks. The plaintiff alleged that she suffered a neurological injury to her left hand as a result of the nurse's battery. The hospital and the hospital authority were joined as defendants under the theory of respondeat superior. The defendants moved to dismiss on the ground that the action was one for medical malpractice and the plaintiff had not attached the required expert affidavit.

The appeal centered around the plaintiff's contention that the trial court erred in finding that her complaint was one for medical malpractice because the nurse's decision to ignore the plaintiff's requests involved medical judgment. The court had to decide whether a medical professional who continued with a procedure after the patient instructed the professional to stop was exercising medical judgment. If so, an expert affidavit was required under the malpractice statute.[14.2]

Under the circumstances, the court agreed with the trial court that medical judgment was involved, and that an expert affidavit was necessary. The court ruled that the plaintiff's action alleging battery was actually one for medical malpractice even if she acted clearly and spoke in a manner that left no doubt in the minds of reasonable people that she was revoking her consent to the procedure. The action was one for malpractice because an expert opinion was necessary to determine whether it would have been feasible for the nurse to abandon the procedure without detrimentally affecting the patient's health.

### [3]—Failure to Act

While affirmative nursing actions are the subject of most lawsuits, a nurses's failure to act can also be the proximate cause of injury to the patient. Failure to act is deemed negligence only when the nurse had a duty to act.[15] An example of negligent failure to act might be seen in a coronary care unit. If a patient in that unit begins experiencing cardiac arrhythmia, such as premature ventricular contractions, the specially-trained coronary care nurse has a duty to be constantly

[14.2] O.C.G.A. § 9-11-9.1.

[15] *See, e.g.,* Abille v. United States, 482 F. Supp. 703 (N.D. Cal. 1980). A nurse breached the standard of due care under Alaska law by allowing an unescorted, suicidal patient to leave the ward and reach a window from which he leapt to his death.

Koeniguer v. Eckrich, 422 N.W.2d 600 (S.D. 1988). In a malpractice action against a hospital based on negligence of the nursing staff, the focus is whether the nurse provided reasonable care

apprised of what is showing on the patients' coronary monitor and to act when appropriate. Failure to administer electroshock to the patient with cardiac arrhythmia can cause death, while timely action can restore a normal heart rhythm. The nurse's failure to act can mean loss of life for the patient and liability for the nurse.

### [4]—Failure to Communicate

While failure to communicate is closely related to the more general failure to act,[16] it can, at times, be the sole specific cause of injury.[17] The nurse's negligence in not communicating initial abnormal data to the physician has not been the only subject of lawsuits; the failure to communicate changes in a worsening patient's condition has also been litigated.[18] Clearly, communication of significant data, and the exercise of sound judgment as to what is "significant" regarding the status of the patient, are obligations imposed by both the courts and the nursing profession.[19] However, in order for liability to be imposed, it must be

---

[16] *See* ¶ 16A.03[3], *above*.

[17] *See, e.g.,* Phillips v. Eastern Me. Medical Center, 565 A.2d 306 (Me. 1989). Plaintiff's decedent went to the defendant's emergency room after a piece of meat became caught in his throat. A surgeon removed the meat. After the surgery, the patient had symptoms that signaled that there was a tear in the esophagus, but the nurse did not inform the surgeon of the patient's distress until six hours later. Although an operation to repair the tear was performed, the patient eventually died. The court held that the failure of the hospital staff to notify the surgeon of the patient's pain was a departure from the recognized standard of care.

Ramsey v. Physicians Memorial Hosp., 36 Md. App. 42, 373 A.2d 26 (1977). The mother of a boy treated in the emergency room had removed two ticks from her son and communicated this fact to the emergency room nurse, who did not inform the emergency room physician. This history was crucial, in that symptoms of Rocky Mountain Spotted Fever and measles are not easily differentiated. The court based a finding of liability on the failure of a nurse to notify a physician of the patient's history involving removal of ticks.

[18] *See, e.g.,* Karringan v. Nazareth Convent & Academy, 212 Kan. 44, 510 P.2d 190 (1973). A 10-hour delay in contacting a doctor was held unreasonable.

Thomas v. Corso, 265 Md. 84, 288 A.2d 379 (1972). When the decedent's vital signs worsened in the emergency room, nurses had an obligation to notify a physician.

*But see* Dumas v. West Jefferson Med. Ctr., 722 So. 2d 1210, 1213 (La. Ct. App. 1998). The defendant obstetrical nurse did not breach the standard of care and so could not be liable in the plaintiff's medical malpractice suit. The issue was whether the defendant failed to timely inform the attending obstetrician of all late decelerations so that the obstetrician could make a judgment as to whether an emergency cesarean section was indicated for the plaintiff. The child was born with brain damage and died seven days after delivery.

*Cf.* Nastasi v. United Mine Workers of Am. Union Hosp., 209 Ill. App. 3d 830, 567 N.E.2d 1358, 153 Ill. Dec. 900 (1991). The patient claimed that the nursing staff was negligent in failing to detect the seriousness of his condition and to notify a physician of that condition. The court held that proximate cause in a medical malpractice action may be proven by evidence which shows to a reasonable certainty that negligent diagnosis or treatment caused the treatment to be less effective. A directed verdict for the hospital was proper where no medical testimony was offered to support the claim that the acts by the nursing staff had any impact on treatment.

shown that the failure to communicate was the proximate cause of the patient's injury.[20]

Most hospitals require all patients in a unit to be assessed an acuity rating at the beginning of each shift. This is ordinarily a number reflecting the severity of a patient's condition and the anticipated amount of nursing care required. For example, a stable preoperative patient with no significant complaints might be rated a 1, whereas a critical patient requiring an extraordinary amount of one-on-one care might be a 5. The total acuity rating for each nurse is arrived at by adding the ratings of all the nurse's patients. Often nurses exceed the rating set by hospital policy because of understaffing or changes in the patient population during a shift. Nurses have a responsibility in such circumstances, beyond any duty the hospital might bear, to communicate to their superiors that they cannot adequately care for their patients. Failure to do so or to reduce an excessive acuity total, followed by patient injury, is persuasive evidence of negligence.

### [5]—Error in the Use and/or Supervision of Equipment

Burns are probably the most common injury sustained by the patient when a nurse is negligent in the use or supervision of equipment. Protecting patients from equipment hazards is a responsibility the nurse assumes when utilizing hot packs, enema sets, electrical equipment, and the like.[21] The nurse has been held responsible even when

---

*See also* American Nurses Association, Standards of Nursing Practice, Standard 1, 1973.

*Cf.* Georgia Osteopathic Hosp., Inc. v. O'Neal, 198 Ga. App. 770, 403 S.E.2d 235 (1991). The plaintiffs' decedent was hospitalized for treatment of headaches, hypertension and possible impending stroke. A variety of drugs, including Tigan, Nubain, Flexeril, Indocin, Halcion, Robaxin, Dalmane, Soma and Haldol, were prescribed. The decedent experienced mental status and behavioral changes, whereupon the nurses contacted the decedent's physician to express their concern and report the changes. The medications were discontinued but the next day the decedent attacked several people with a knife. The police arrived and shot the decedent. The Court of Appeals found that there was no evidentiary basis for the jury to conclude that the decedent's death was proximately caused by a failure on the part of the nurses to communicate information about the decedent to his physician.

[20] *See, e.g.:*

Georgia Osteopathic Hosp., Inc. v. O'Neal, 198 Ga. App. 770, 403 S.E.2d 235 (1991). A hospital could not be held liable for the alleged failure of nurses to communicate to physicians the berserk condition of a mental patient who attacked people and was later killed by police. There was insufficient evidence that the failure to communicate proximately caused the patient's death.

Howerton v. Mary Immaculate Hosp., Inc., 264 Va. 272, 563 S.E.2d 671, 673–674 (2002). It was for the jury to decide whether the negligence of the defendant hospital's nurses in contacting a doctor was the proximate cause of the injuries suffered by the plaintiff's newborn daughter. The plaintiffs alleged that the nurses' negligence caused injuries arising from the daughter's delayed delivery. There was evidence that the nurses delayed informing the OB/GYN for 25 minutes that the mother's condition had changed, and that she was not experiencing intense and different abdominal pain, and a child neurologist testified that if the baby had been delivered

AAJ NEWS
RESEARCH
ISSUE RESOURCES
Medical Negligence
In the Courts
Dangerous and Defective Products
Foreign Manufacturer Accountability
Forced Arbitration
WHY WE NEED THE CIVIL JUSTICE SYSTEM

## HOW THE CIVIL JUSTICE SYSTEM PROTECTS PATIENTS

While the political debate over medical negligence tends to focus on doctors' insurance premiums or health care costs, one very important factor is often overlooked: the injured patients.

The injuries patients suffer from preventable medical errors are very real. Some are easily calculated, such as additional medical costs and lost wages, while others are less so, such as quality of life and pain and suffering. The problem with many medical negligence reforms is that they do not seek to prevent medical errors, but merely to shift the burden of these damages to the injured patients themselves.

Caps on non-economic damages are one such "reform" that do nothing to reform medical negligence at all. Non-economic damages compensate patients for very real injuries—such as the loss of a limb or sight, the loss of mobility, the loss of fertility, excruciating pain, or severe disfigurement, or even the loss of a child or a spouse. In the name of a "medical negligence crisis" many states have moved to cap these damages. The effect is often to render many medical negligence cases too expensive to bring to trial, especially for women, children, the elderly and the disabled—those who may not have suffered substantial economic loss. University of Buffalo law professor Lucinda Finley found that such groups received restitution far below average levels, and had a far harder time even getting to court because the expenses of a case often outweighed any potential award. She concluded, "caps benefit insurance companies by increasing their profits, while producing no benefit for doctors, and causing a detriment to injured people, especially women and the elderly."[i] The "reform" takes away the restitution, but does nothing to prevent the injuries.

### The Bridgeport Hospital Experience

In the late 1990's, hospital administrators at Bridgeport Hospital in Bridgeport, Connecticut, were aware of a rash of infections caused by unsanitary conditions. Attempts to identify possible causes and solutions were ignored, partly for financial reasons. Eventually the staph outbreak resulted in a series of deaths. Lawsuits filed as a result uncovered a range of dangerous practices in the hospital, such as doctors not washing their hands before surgery and wearing non-sterile clothes in the operating room.

As a result, Bridgeport Hospital embarked on a $30 million renovation. The hospital upgraded its air filtration system and hand washing stations, and made changes to staff practices, such as a prohibition on doctors wearing scrubs home. These improvements drastically cut infection rates, from 22 percent of cardiac surgery patients to nearly zero.

### Civil Justice and Patient Safety

Such reforms also take away a powerful deterrent to medical negligence. The civil justice system not only provides patients with their constitutional right to seek restitution for their injuries in a court of law; it also encourages patient safety systems that help prevent negligence before it occurs. Hospitals, such as Connecticut's Bridgeport Hospital, have reformed dangerous practices because of litigation. In some cases, entire medical fields have been transformed.

### More Tort Reform Equals Worse Health Care

Medical negligence lawsuits serve an important role in promoting public health and patient safety. Evidence suggests that the lessening of accountability that comes from reforms such as medical negligence caps can have a detrimental effect on patient safety and health care quality. A study from the American College of Emergency Physicians found that safety improves when injured patients can hold negligent hospitals or physicians accountable. States with aggressive legislation limiting patient access to the legal system are also the states that score lowest in patient safety. Overall, the 10 states doctors claim have the "best liability environment" (more tort reform) have a D+ score for patient safety (just two points above fail). In contrast, the 10 states doctors claim have the "worst liability environment" have a B- for patient safety, above the C+ national average. The 25 states with "best liability environments" all rank below the national average for patient safety.

A study conducted by the National Bureau of Economic Research found that strict tort reforms adversely affect patient outcomes. The researchers found that a 10 percent increase in malpractice costs was associated with a 0.2 percent decrease in mortality rates. The authors concluded that, "while the mortality rates may be quite modest, these seem more likely than not to justify its direct and indirect heath care costs."[ii]

Similarly, data collected from the non-partisan Commonwealth Fund show health care in states that cap damages in medical negligence cases tends to be of lower quality than health care in states that do not.[iii] Patients in states that do not cap damages have better access to health care and are more likely to be covered by health insurance than patients living in states with caps on damages. The aforementioned study from Tulane University also found that states with more accountability experienced lower rates of mortality.[iv] Analysis by Professors David Hyman and Charles Silver also found that insulating providers from liability was detrimental to patient safety, and concluded, "The widely held belief that fear of malpractice liability impedes efforts to improve

Doc # 6 page 1 of 4

amednews.com
AMERICAN MEDICAL NEWS

PROFESSION

# Disparities in care for blacks linked to segregation, unconscious bias

■ Black patients are less satisfied with care from doctors who show unintentional bias. Highly segregated areas have disparities in lung cancer death rates, research shows.

**By KEVIN B. O'REILLY (HTTP://WWW.AMEDNEWS.COM/APPS/PBCS.DLL/PERSONALIA?ID=KOREILLY) amednews staff — Posted Jan. 28, 2013**

Two studies published in January highlight the challenges blacks face in accessing equitable, quality health care.

In one study, primary care physicians found to have unconscious bias against blacks received lower marks from their African-American patients on measures of trust and communication skills. Another study found that racial segregation exacerbates disparities in lung cancer mortality.

More than 130 Denver-area primary care doctors and other health professionals such as nurse practitioners took psychological tests that measure implicit bias toward different racial and ethnic groups. Test takers were shown a series of faces, along with positive words such as "joy" and bad words such as "nasty."

The speed with which the test taker associates the words with black or white faces demonstrates the existence and extent of their unconscious bias. The assessment, called the implicit association test, has been used in more than 700 studies in health care, psychology, market research and political science.

About two-thirds of the Denver doctors showed implicit bias against blacks, with 43% landing unconscious bias scores graded as moderate or strong, said the study, published January in *Annals of Family Medicine*. Then, nearly 3,000 of all the physicians' patients were surveyed and asked to rate the doctors on items such as knowledge of the patient, patience, caring, how well they explained things and how much they helped with decision-making.

All of the patients, regardless of their race or ethnicity, gave their doctors generally good scores. On a 100-point scale, whites gave their doctors an average score of 82, compared with 80 for black patients.

But black patients cared for by doctors who demonstrated unconscious bias on the psychological testing gave those doctors much worse ratings, nearly five points lower on average. For example, physicians who showed strong bias on the testing got a grade about six points lower on a survey about interpersonal treatment that measures perceived friendliness and respect. More than 80% of the physicians were white, and the rest were Hispanic or black.

WEB IMAGES VIDEOS MAPS NEWS MORE

Bing bpt hos.emergency room discrimination

88,500,000 RESULTS Any time

**Discrimination** in the **Emergency Room**? Yes, It Happens!
minorities.affordablehealthinsurance.org/2013/03/**discrimination**-in...
Studies have shown that **emergency room** wait periods are onw hour longer for African -Americans than any other race. ... + **Discrimination** in the **Emergency Room**?

Fresno Hospital **Discrimination** - Case Profile | American Civil ...
www.aclu.org/.../fresno-**hospital**-**discrimination**-case-profile
Fresno Hospital **Discrimination** - Case Profile ... the driver would not allow Teresa to accompany Kristin into the **emergency room** even though Kristin had ...

**emergency room**, palm bay hospital, holmes regional medical ...
www.health-first.org/**hospitals**_services/emergencies_of_all_sizes.cfm
Cape Canaveral Hospital's **Emergency Room** (ER) is here to help you and your family whenever an **emergency** arises. ... Non **Discrimination** Policies ...

Hearts of Space
www.**hos**.com
classic **hos** mix; ambient world mix; celtic space; free. 6 minute intro; **hos** minutes; sample show; sample album; plans. full service; standard service; basic service ...

Riv. Hospital Patient **Discrimination** - Home - Precinct Reporter ...
www.precinctreporter.com/community/...charges-patient-**discrimination**
An older Black man came into the **emergency room** intoxicated, ... one African American nurse filed a **discrimination** lawsuit against a hospital for race and age ...

**EMERGENCY ROOM**
emergencyrooms.org
**EMERGENCY ROOM** Official **Emergency Room** website from Thierry Geoffroy / Colonel ( contact + infos) Description of the Format Coverage / Critics Artists ...

**Emergency** Quota Act - **Discrimination**
**discrimination**1920.weebly.com/**emergency**-quota-act.html
**Discrimination**: Home; KKK; Immigration After WWI; Quota System; **Emergency** Quota Act ; ... 1921 **Emergency** Quota Law." U.S. Immigration Legislation: 1921 **Emergency** ...

Race Matters - Hidden in the World of Medicine, **Discrimination** ...
www.racematters.org/medical**discrimination**.htm
A recent study showed that women with chest pain waited longer than men did for **emergency room** examinations. ... Is it **discrimination**, ...

1 2 3 4 5 Next

© 2013 Microsoft | Privacy and Cookies | Legal | Advertise | About our ads | Help | Feedback

RELATED SEARCHES
Bridgeport Hospital School of Nursing
Bridgeport Hospital Address
Yale New Haven Hospital Employment
BPT Hosp **Credit Union**
BPT Hosp **Intranet**
BPT Hosp **Jobs**
St. Vincent's Hosp BPT

This spa
reserved f
frienc

Connect witl



They make search m

AFFORDABLE HEALTH INSURANCE .org

GET FREE QUOTES
Compare and Save
ENTER ZIP
Go

44

The Health & Healthcare Blog For Minorities

WEDNESDAY, MARCH 13, 2013

## Discrimination in the Emergency Room? Yes, It Happens!



Anyone who has visited a hospital emergency room knows the wait can be long. In fact, the average wait period is 349 minutes, according to a study by the University of Pennsylvania School of Medicine. However, that same study showed that the average wait period for African-Americans was about an hour longer--more than any other race. Coincidence? Or discrimination?

The longer patients have to wait, the greater the risk is of death. Emergency room waits of six or more hours have been linked to increased death rates for patients admitted to the Intensive Care Unit (ICU). Yet, 50 percent of African-American patients wait six or more hours before being admitted. This compares to 37 percent for other races whose wait was six or more hours. Those who conducted the study could find no real evidence for the difference.

**Different Prescriptions Based On Your Color??**

ForThe Journal of the American Medical Association also reports their findings that indicates differences in prescribing treatment of pain in the emergency department. Their report states "Differential prescribing by race/ethnicity was evident for all types of pain visits, was more pronounced with increasing pain severity," and "white patients remaining significantly more likely to receive an opioid prescription than black patients, Hispanic patients, and Asian/other patients."

Regardless of the reasons, the result is that minorities are at greater risk in the emergency room. While the Affordable Care Act will make access to health care

Individual Health Plans
www.IndividualHealthQuotes.com
Get Individual Health Insurance Quotes. Compare Plans Online. Free!
Senior Health Insurance
www.MedicareSolutions.com
Health Insurance Plans for Seniors. View All Plans & Prices Online.
3 Quotes — Medical Alerts
www.TopMedicalAlertCompanies.com
Get Free Quotes in Only 1 Minute. Compare Rates Here. Save $100s Now.
Online Nursing Degrees
www.WGU.edu/Nursing
Advance Your Career w/ a Bachelor's or Master's Degree. Sign Up Today!
AdChoices



more affordable for more people, the quality of care must also improve to ensure that everyone, regardless of their social or economic status, receives equal medical treatment.

**SHARE THIS PAGE:**

Tweet44




**More News:**

▼ 2013 (73)

- ► August (5)
- ► July (10)
- ► June (8)
- ► May (11)
- ► April (10)
- ▼ March (14)
  - + Arthritis and African-Americans: 8 Ways to Control...
  - + Top Foods To Protect Your Immune System From Colds...
  - + How Safe (or Unsafe) Are Tattoos? Can Tattoo Ink L...
  - + 5 Easy Ways to Lower Your High Blood Pressure - Wi...
  - + African-American Men Have Highest Rate of Prostrat...
  - + What's Really In Your Fast Food? Do You Want Lies ...
  - + Over 4 Million African Americans Have Been Diagnos...
  - + Discrimination in the Emergency Room? Yes, It Happ...
  - + Why Black Senior Citizens Are Twice As Likely To G...
  - + Smoking Is Bad For Everyone, But Especially Africa...
  - + In 2013, 600,000 People Will Die From A Heart Atta...
  - + You Already Know You Should Do It, But Here's 5 Ve...
  - + First Lady Michelle Obama Fights High Childhood Ob...
  - + Nursing Home Abuse Higher Among Black Americans
- ► February (15)

Doc. 3

Home About Us Find A Health Plan Health Insurance 101 Glossary Minorities News/Blog

AFFORDABLE HEALTH INSURANCE.org

GET FREE QUOTES
Compare and Save
ENTER ZIP
Go

?

The Health & Healthcare Blog For Minorities

SUNDAY, FEBRUARY 3, 2013

## Racist Doctors? New Study Shows 66% of Doctors (And Nurses) Are Racially Biased Towards Their Black Patients



A recent test given to doctors and nurses showed that 2/3 of them are unconsciously biased against their African American, Hispanic and other minority patients. During the study, which was published in *Annals of Family Medicine*, more than 130 primary care doctors and nurse practitioners in the Denver, Colorado area took psychological tests that measure implicit bias toward different racial and ethnic groups. The results were quite shocking!

Just how legit was this test? Very legit! It's called the Implicit Association Test, and it has been used in more than 700 studies in health care, psychology, market research and political science around the world. The speed in which the test is conducted demonstrates the existence and extent of the test taker's unconscious bias.

Kevin B. O'Reilly, a writer for American Medical News, wrote, "If the persistence of unconscious bias poses a challenge for physicians struggling to connect with their minority patients, racial segregation appears to present a larger and deadlier quandary that extends well beyond the doctor's office."

**For more details about the study, visit:**
www.ama-assn.org/amednews/2013/01/28/prsa0128.htm

**Opioid Dependence Doctors**
TurnToHelp.com
Find a doctor who can prescribe a private, in-office treatment.

**$19 Month - Health Plans**
Affordable-Health-Insurance-Plans.org
New 2013 Discounts. Save 55% - 75%. See If You Qualify Instantly (Free)

**Medicare Supplement Plans**
www.MedicareSolutions.com
Compare Medicare Supplement Plans. View All Plans & Prices Online.

**Medicare® Part A-B-C-D**
www.healthplansamerica.org/Medicare
Compare Medicare Plans & Providers. Sign Up for Free Quote or Call 24/7
AdChoices

*Fix Your Thyroid = Feel Young!*



Dr. Jones of the Women's Health Institute of Texas reports that most women who struggle with fatigue, brain fog, thinning hair and weight gain actually suffer from a thyroid condition that is simple to fix with a proven natural remedy. More from this article...

1B

Precinct Reporter Group








**PRGroup News**

Civil Rights Leaders Meet with President Obama on

**Search --->**

search...

*Weather SB*

undefined

*AP News --->*

## *Riv. Hospital Patient Discrimination*

**By Dianne Anderson**

Tokozile Narcisse's recent discrimination complaint against Riverside Parkview Hospital represents just one of a slew of racial discrimination cases cropping up nationwide of Black health professionals fed up with being denied the right and opportunity to do their jobs.

Narcisse said her case is currently under review by the Equal Employment Opportunity Commission, which has settled several similar lawsuits over the past decade.

This summer, after coming to the defense of a Black patient who was harassed and denigrated by a doctor, Narcisse claims she became the target of retaliation.

"[I hope] that they'll think again before another Black person walks through there, and they won't be ugly towards them," she said.

An older Black man came into the emergency room intoxicated, and Narcisse said she was shocked to see the doctor downloading black-face images to his computer. The doctor printed out and started waving images of Bill Cosby and Red Foxx in front of the man, insinuating that he looked like the entertainers, like a fool.

She said the doctor began antagonizing the man, saying, "What's up man, cool breeze, drunk again?" She felt so embarrassed for the patient that she went into his room to apologize, when the man told her he was a Vietnam veteran.

"It was shameful and despicable," said Narcisse, who was working as a nurse in charge of the emergency room.

For the outcome, she hopes the case will draw attention to growing discrimination against Black health professionals, and the hospital will adhere to a zero mistreatment policy toward Black patients.

In coming to the defense of the patient, she said she was accused of being "rough around the edges."

"I'm like really? How so, pray tell?" she said. "What I'm increasingly finding is just by walking in the door, it's almost inevitable you'll run into this kind of issue."

Narcisse, whose father is from Zimbabwe and mother is African American, was raised in Philadelphia, is world traveled and speaks several languages. As a military wife, she's also recently lived and worked in the Middle East.

She said that Black male nurses are also getting stigmatized as violent. Another colleague, a former football player, was accused of being intimidating because he alerted a nurse that he was leaving the floor, and couldn't take any more patients into the unit.

"He did nothing wrong, he had a routine conversation," she said. "By the time he got back he was notified that he intimidated her."

Defending African American patients as a head nurse in the emergency room has caused problems, she said, that have not been properly addressed by her superior, or by Human Resources. Two months later after her first complaint, she involved the union because the case had stalled, and not long after, she said unsubstantiated complaints about her surfaced.

**Advertisement --->**




**PRNews Flash --->**

Doc 13

HOME ENTERTAINMENT/SPORTS COMMUNITY NATION/WORLD COMMENTARY LIFESTYLES RELIGION CALENDAR ADVERTISE




You are here: Home ▸ Community ▸ Inland Empire ▸ Riv. Hospital Patient Discrimination

**PRGroup News**

Civil Rights Leaders Meet with President Obama on

**Search --->**

search...

## *Riv. Hospital Patient Discrimination*

**By Dianne Anderson**

Tokozile Narcisse's recent discrimination complaint against Riverside Parkview Hospital represents just one of a slew of racial discrimination cases cropping up nationwide of Black health professionals fed up with being denied the right and opportunity to do their jobs.

Narcisse said her case is currently under review by the Equal Employment Opportunity Commission, which has settled several similar lawsuits over the past decade.

This summer, after coming to the defense of a Black patient who was harassed and denigrated by a doctor, Narcisse claims she became the target of retaliation.

"[I hope] that they'll think again before another Black person walks through there, and they won't be ugly towards them," she said.

An older Black man came into the emergency room intoxicated, and Narcisse said she was shocked to see the doctor downloading black-face images to his computer. The doctor printed out and started waving images of Bill Cosby and Red Foxx in front of the man, insinuating that he looked like the entertainers, like a fool.

She said the doctor began antagonizing the man, saying, "What's up man, cool breeze, drunk again?" She felt so embarrassed for the patient that she went into his room to apologize, when the man told her he was a Vietnam veteran.

"It was shameful and despicable," said Narcisse, who was working as a nurse in charge of the emergency room.

For the outcome, she hopes the case will draw attention to growing discrimination against Black health professionals, and the hospital will adhere to a zero mistreatment policy toward Black patients.

In coming to the defense of the patient, she said she was accused of being "rough around the edges."

"I'm like really? How so, pray tell?" she said. "What I'm increasingly finding is just by walking in the door, it's almost inevitable you'll run into this kind of issue."

Narcisse, whose father is from Zimbabwe and mother is African American, was raised in Philadelphia, is world traveled and speaks several languages. As a military wife, she's also recently lived and worked in the Middle East.

She said that Black male nurses are also getting stigmatized as violent. Another colleague, a former football player, was accused of being intimidating because he alerted a nurse that he was leaving the floor, and couldn't take any more patients into the unit.

"He did nothing wrong, he had a routine conversation," she said. "By the time he got back he was notified that he intimidated her."

Defending African American patients as a head nurse in the emergency room has caused problems, she said, that have not been properly addressed by her superior, or by Human Resources. Two months later after her first complaint, she involved the union because the case had stalled, and not long after, she said unsubstantiated complaints about her surfaced.

*Weather SB*

undefined

*AP News --->*

**Advertisement --->**




**PRNews Flash --->**

"From the point I involved the union, I was unofficially demoted. I have not worked in a charge [supervisory] capacity since," she said.

A registered nurse for 18 years, she said Black nurses are disproportionately and unfairly receiving Do Not Return status on the Registry, simply for speaking up, or for no reason at all.

In Los Angeles, she worked as a registry nurse in the emergency room when she questioned who left a Black elderly woman slumped over, drooling in the chair. The woman obviously suffered a stroke, and was later admitted, had been improperly left unassisted by a white triage nurse. Narcisse came out of the nursing station, saw the woman, and started asking questions. Later, she was told Do Not Return to the hospital.

She said it is dangerous when medical staff refuse proper treatment to Black patients, or nurses refuse to take orders from their Black superiors, because of their own prejudices.

Since she notified the manager of the young doctor's racial harassment, she said she's dealt with retaliation. Locally, at Parkview Hospital, she brought the incident of the Black Vietnam veteran to her manager, and it hasn't received proper follow up.

Over the years, the EEOC has settled several complaints of Black nurses denied work by facility administrators at the request of their white patients.

Earlier this month in Texas, one African American nurse filed a discrimination lawsuit against a hospital for race and age discrimination, alleging administrators tried to rid its Black employees by making the work environment unbearable. The lawsuit claims all Black employees suffered discrimination and were either fired or ousted from the Harrison County Hospital.

In a separate recent Texas case, another Black nurse also has a discrimination case for wrongful termination from the Community Hospital of Brazosport.

In Albuquerque, the local branch NAACP filed their complaint with the Justice Department earlier this month, that a decade of workplace discrimination has driven out 80 percent of the Black doctors at the University of New Mexico.

Narcisse has worked primarily in emergency rooms, and said that Black nurses on Registry are routinely placed on the Do Not Return to the facility staff status at community hospitals throughout California.

She said that she is in communication with the union at Parkview Hospital, and has been told they are gathering more data.

Parkview Human Resources did not answer the phone, and the hospital's union representative working on the case did not return calls for comment by press time.

***written by: precinct reporter group***


August 14, 2013 - Sparks; Parker Named Western Conference Player of the Month

...

Read more


June 20, 2013 - Coyote Athletes Earn Year End Honors

...

Read more


October 13, 2012 - Coyotes Share First Place in CCAA

...

Read more


November 01, 2012 - Tough Weekend For Cal Poly Volleyball




## Precinct Reporter News

*SCE ENERGY WALK*



In efforts to raise awareness of more ways to save energy and money, Southern California Edison (SCE) conducted an Energy Walk for small businesses in the ...

***read full article***

   

*Education*

Aug 09 2013 Education

**Blacks Attend 'Racially Separate' Colleges...**

...

- HBCUs are Still Highly Valued Institutions
- Robinson Announces Retirement
- UCI & Institute on Aging Launch Mobile App
- CSUSB UPWARD BOUND, $1.2M GRANT

*Spotlight On Entertainment*



*Spotlight On Sports*



*Business And Finance*

Jun 17 2013 Business & Finance

**UNION BANK SERVES LOW INCOME COMMUNITIES...**

...

- Blacks Optimistic about Finances
- Wells Fargo Home Loan Settlement
- Boomers' Experience, Asset in Job Search
- Have You Seen 'Red Tails' Yet?